## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 24-90571 (CML)** |
| **VROOM, INC.** | § | |
| | § | **Chapter 11** |
| **Debtor.** | § | |

### UNITED STATES TRUSTEE'S OBJECTION TO DEBTOR'S PREPACKAGED PLAN OF REORGANIZATION FOR VROOM, INC. UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Kevin M. Epstein, the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**"), hereby files this Objection (the "**Objection**") to the *Debtor's Prepackaged Plan of Reorganization for Vroom, Inc. under Chapter 11 of the Bankruptcy Code* [ECF No. 7] (the "**Plan**"),[1] and represents as follows:

### SUMMARY OF OBJECTION

1.     The U.S. Trustee objects to confirmation of the Plan for the following reasons:

    a.  The proposed nonconsensual releases of non-debtor third parties by non-debtor third parties contained in the Plan are not authorized under the United States Bankruptcy Code;

    b.  The proposed opt-out provisions in the Ballots and the Non-Voting Notices approved by the Court— by which parties who vote to accept or reject the Plan, or are deemed to have accepted or rejected the Plan, or who abstain from voting are bound by the Third-Party Release unless they opt out—are ineffective to confer affirmative consent to Third-Party Release;

    c.  The Plan would also impose the Third-Party Release on a wide variety of related parties, who are given no notice, and who will not be asked for their consent to the releases; and

    d.  The Plan includes an injunction to enforce the Third-Party Release and the Plan's exculpation provision in violation of the *Purdue* decision and the

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Solicitation Motion, the Disclosure Statement, and Plan.

Bankruptcy Code, and the Debtor has not met the standard for entry of an injunction.

## PROCEDURAL BACKGROUND

2.      On November 13, 2024, Vroom, Inc. (the "**Debtor**") filed a voluntary petition under chapter 11 of title 11 of the United States Code.

3.      Along with its voluntary petition, the Debtor filed its *Prepackaged Plan of Reorganization for Vroom, Inc. under Chapter 11 of the Bankruptcy Code* (the "**Plan**") [ECF No. 7] and the *Disclosure Statement for the Prepackaged Plan of Reorganization from Vroom, Inc. under Chapter 11 of the Bankruptcy Code* (the "**Disclosure Statement**") [ECF No. 8].

4.      Additionally, the Debtor filed an *Emergency Motion for Entry of an Order (I) Scheduling Combined Hearing On (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Fixing Deadline To Object To Disclosure Statement and Plan; (III) Approving (A) Solicitation Procedures, (B) Form and Manner of Notice of Commencement, Combined Hearing, and Objection Deadline, and (C) Notice of Non-Voting Status and Opt-Out Opportunity; (IV) Conditionally Approving Disclosure Statement; (V) Conditionally (A) Directing The United States Trustee Not To Convene Section 341 Meeting of Creditors and (B) Waiving Requirement of Filing Statements of Financial Affairs and Schedules of Assets and Liabilities; and (VI) Granting Related Relief* (the "**Solicitation Motion**") [ECF No. 9].

5.      On November 14, 2024, the U.S. Trustee filed an Objection to the Debtor's Solicitation Motion (the "**Solicitation Motion Objection**"). [ECF No. 21].

6.      On November 15, 2024, the Court conducted a hearing on the Solicitation Motion and sustained, in part, the U.S. Trustee's Solicitation Motion Objection, finding that all parties, regardless of how they vote on the Plan, must be given the option to opt-out of the Third-Party Release, rather than being deemed to consent if they vote in favor of the Plan. The Court otherwise

approved the Solicitation Motion and conditionally approved the Disclosure Statement. The Court further stated that the U.S. Trustee's objections were carried forward to Plan confirmation.

7.　　The U.S. Trustee hereby renews his objection to the Third-Party Release and opt out procedures contained in the Plan as well as the Plan's injunctive provisions. The U.S. Trustee adopts and incorporates the arguments made in the Solicitation Motion Objection, and requests that confirmation of the Plan be denied.

## RELEVANT FACTUAL BACKGROUND

8.　　Article I.C. of the Plan defines "Releasing Party" to include a wide variety of parties, including (b) all Holders of Claims and Equity Interests that vote to accept this Plan;[2] (c) all Holders of Claims and Equity Interests that abstain from voting on this Plan and who do not affirmatively opt out of the releases provided by this Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in this Plan; [and] (d) all Holders of Claims and Equity Interests that (i) vote to reject this Plan or (ii) are presumed to accept this Plan and who do not affirmatively opt out." As to all such parties, the definition also includes a wide swath of related parties.[3] Plan. Art. I.C.

9.　　Article I.C of the Plan also defines "Released Parties" broadly, including "(a) the Debtor; (b) the Reorganized Debtor; (c) the Debtor's current and former officers, directors, and

---

[2] Although the Court held that all parties must be given the option to opt-out of the Third-Party Release, rather than being deemed to consent if they vote in favor of the Plan, the Debtor was not required to amend the definition in the Plan, Disclosure Statement or Solicitation Materials (defined below).

[3] The list includes "such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), interest holders, predecessors, successors, and assigns, subsidiaries, affiliates, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, underwriters of any securities issued by the Debtor, consultants, representatives, and other professionals, each in their capacity as such collectively."

managers; (d) the Consenting Stakeholders; (e) the Unsecured Notes Indenture Trustee," and

again, a wide swath of their related parties, including, among others, "current and former directors,

managers, officers, equity holders (regardless of whether such interests are held directly or

indirectly), interest holders, predecessors, participants, successors, and assigns, subsidiaries,

affiliates, managed accounts or funds, and each of their respective current and former equity

holders, officers, directors, managers, principals, shareholders, members, management companies,

fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys,

accountants, investment bankers, underwriters of any securities issued by the Debtor, consultants,

representatives, and other professionals." *Id.*

10.     Article X.B.2 of the Plan imposes on Releasing Parties a broad release of the

Released Parties (the "**Third-Party Release**").[4]

---

[4] <u>Release By Holders of Claims and Interests</u>. As of the Effective Date, except for the rights that remain in effect from
and after the Effective Date to enforce this Plan, and the obligations contemplated by this Plan and the Restructuring
Documents, or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the
Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released, to the
maximum extent permitted by law, by the Releasing Parties, in each case from any and all Claims and Causes of
Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtor, the Reorganized
Debtor, or its Estate), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or
unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether
in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law,
or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement
or otherwise, that such Holders or their estates, affiliates, heirs, executors, administrators, successors, assigns,
managers, accountants, attorneys, Representatives, consultants, agents, and any other Persons claiming under or
through them would have been legally entitled to assert in their own right (whether individually or collectively) or on
behalf of the Holder of any Claim or Equity Interest or other Person (collectively, the "Third-Party Released Claims"),
based on or relating to, or in any manner arising from, in whole or in part, (a) the Debtor, the Debtor's capital structure,
the Reorganized Debtor, the Estate, the Chapter 11 Case (including the filing thereof), the Disclosure Statement, this
Plan (including the Plan Supplement), the Restructuring Support Agreement (and any annexes, exhibits, and term
sheets attached thereto), the Unsecured Notes and Unsecured Notes Documents, (b) the subject matter of, or the
transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan, (c) the business or
contractual arrangements between the Debtor and any Released Parties, (d) the negotiation, formulation or preparation
of the Disclosure Statement, this Plan (including the Plan Supplement), the Restructuring Support Agreement (and
any annexes, exhibits, and term sheets attached thereto), the New Warrants Documents, the Plan Securities and any
related documentation, the New Governance Documents, and any other Restructuring Documents, or related
agreements, instruments or other documents, (e) the restructuring of Claims or Equity Interests prior to or during the
Chapter 11 Case, (f) the purchase, sale, or rescission of the purchase or sale of any Equity Interest or Plan Securities
of the Debtor or the Reorganized Debtor, (g) the Confirmation or Consummation of this Plan or the solicitation of
votes on this Plan, and/or (h) any other act or omission; provided, that the foregoing Third-Party Release shall not
operate to waive or release, and the "Third-Party Released Claims" shall not include, any Cause of Action of any

11.     Article X.C also provides a waiver of "any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of providing the release, which if known by it may have materially affected its settlement with the released party."

12.     Article X.F of the Plan contains an injunction that provides that liabilities released or exculpated in the Plan shall be permanently enjoined upon the confirmation of the Plan.

13.     On November 16, 2024, in response to this Court's ruling partially sustaining the U.S. Trustee's objection at the hearing on the Solicitation Motion that parties could not be deemed to consent to the third-party release by virtue of their vote on the Plan, the Debtor filed its *Notice of Filing Revised Ballots and Related Redlines* [ECF No. 36] (the "**Solicitation Materials**"). Attached to the notice were ballots that provide, in relevant part, as follows:

> NOTWITHSTANDING ANYTHING PROVIDED FOR IN THE PLAN, DISCLOSURE STATEMENT, OR THIS BALLOT, IF YOU VOTE TO ACCEPT THE PLAN YOU MAY STILL OPT OUT OF THE THIRD PARTY RELEASE BY CHECKING THE BOX IN ITEM 3 BELOW. YOU MAY ELECT TO OPT OUT OF THE RELEASE CONTAINED IN <u>ARTICLE X.B</u> OF THE PLAN <u>ONLY IF</u> YOU CHECK THE BOX BELOW. IF YOU (A) FAIL TO SUBMIT A VALID BALLOT BY THE VOTING DEADLINE, (B) SUBMIT THE BALLOT BUT ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN WITHOUT CHECKING THE BOX BELOW, OR (C) VOTE TO ACCEPT OR REJECT THE PLAN WITHOUT CHECKING THE BOX BELOW, IN EACH CASE YOU WILL BE DEEMED TO CONSENT TO THE RELEASES SET FORTH IN <u>ARTICLE X.B</u> OF THE PLAN.

[ECF No. 36-1 at pg. 21].

---

Releasing Party: (1) against a Released Party arising from any obligations owed to the Releasing Party that are wholly unrelated to the Debtor or the Reorganized Debtor; (2) expressly set forth in and preserved by this Plan or related documents; or (3) arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, gross negligence, willful misconduct or criminal conduct. Notwithstanding anything to the contrary in the foregoing, the "Third-Party Release" set forth above does not release any post-Effective Date obligations of any Entity under this Plan or any document, instrument or agreement executed in connection with this Plan.

## JURISDICTION

14.     The Court has jurisdiction to consider this matter under 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2).

15.     Kevin M. Epstein is the duly appointed U.S. Trustee for Region 7. The U.S. Trustee has standing to raise, appear and be heard on any issue in a case or proceeding under the Bankruptcy Code. 11 U.S.C. § 307.

16.     The U.S. Trustee has a statutory duty to monitor the administration of cases commenced under the Bankruptcy Code. 28 U.S.C. § 586(a)(3). In chapter 11, the U.S. Trustee's supervisory responsibilities include monitoring plans and disclosure statements and filing comments with the court. 28 U.S.C. § 586(a)(3)(B).

## OBJECTIONS

**A.     Statutory Standard**

17.     Section 1129(a) of the Bankruptcy Code provides that "[t]he court shall confirm a plan only if it complies with all" requirements of section 1129(a). 11 U.S.C. § 1129(a). The Bankruptcy Code further requires that the "[t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Among other requirements, section 1129(a) mandates that "[t]he plan complies with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(1).

18.     The Debtor bears the burden of establishing that the Plan complies with all elements of section 1129. *In re Cypresswood Land Partners, I*, 409 B.R. 396, 422 (Bankr. S.D. Tex. 2009) ("The Debtor, as the proponent of the [plan], has the burden of proving that all elements of 11 U.S.C. § 1129(a) are satisfied."). The Debtor, as plan proponent, bears the burden of proof with respect to the confirmation requirements by a preponderance of the evidence. *Heartland Fed. Savs. & Loan Ass'n v. Briscoe Enters. (In re Briscoe Enters.)*, 994 F.2d 1160, 1165 (5th Cir. 1993)

6

(stating that "[t]he combination of legislative silence, Supreme Court holdings, and the structure of the Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown").

**B.    Objection No. 1 - The Bankruptcy Code Does Not Authorize Nonconsensual Third-Party Release**

19.    Nonconsensual Third-Party Release are not authorized under the United States Bankruptcy Code. *Harrington v. Purdue Pharma, L.P.*, 144 S. Ct. 2071, 2082–88 (2024).

20.    This has long been the conclusion held by the Fifth Circuit Court of Appeals. *See Bank of N.Y. Tr. Co. v. Off. Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 252 (5th Cir. 2009) (observing that prior Fifth Circuit authority "seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions").

21.    The Supreme Court in *Purdue* did not address whether consensual non-debtor releases can be included in a chapter 11 plan and confirmation order. For the reasons discussed below, failure to check an opt-out box on a ballot does not constitute consent to a non-debtor release in a chapter 11 plan. Although opt-out provisions have been approved in some cases in the Southern District of Texas, a careful analysis of applicable law warrants reconsideration of the conclusion that imposing non-debtor releases based on a failure to opt out is permissible.  As explained below, state contract law governs whether non-debtors have agreed to a release.  There is no federal law that preempts the requirements of state contract law for such releases.  The cases in this district that have approved non-debtor releases based on a failure to opt out did not apply state law.  Instead, they bound creditors to non-debtor releases based on a failure to opt out because they treated the creditors' silence as a form of litigation default or analogized to class actions.  But as explained below, neither of those theories supports disregarding applicable state law.  In addition, the Plan imposes these releases on numerous related parties without notice or opportunity

7

to consent to the imputed release. The Debtor is unable to show that any of these parties have affirmatively consented to the non-debtor releases as they have received no notice or opportunity to even submit an opt-out ballot.

### i. *State Law Governs Whether a Release in Consensual*

22.     Whether parties have reached an agreement—including an agreement not to sue— is governed by state law.  The only exception is if there is federal law that preempts applicable state contract law.  *See, e.g., Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to supply one, 'state law must govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471–72 (1965)).

23.     No such exception applies here.  There is no federal law generally governing when or whether the non-debtor Releasing Parties have agreed to release the non-debtor Released Parties. No Bankruptcy Code provision addresses how to determine whether one non-debtor has agreed to extinguish its direct claims against another non-debtor. And no Code provision authorizes courts, as part of an order confirming a chapter 11 plan or otherwise, to "deem" a non-debtor to have consented to an agreement to release claims against other non-debtors where consent would not otherwise be found to exist under state law.  Nor does 11 U.S.C. § 105(a) itself confer any power to override state law.  Rather, section 105(a) "serves only to carry out authorities expressly conferred elsewhere in the code."  *Purdue Pharma, L.P.*, 144 S. Ct. at 2082 n.2 (quotation marks omitted).  Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor do they possess a "roving commission to do equity."  *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted). Accordingly, any authority to include third-party releases in a plan must derive from some other

source of law. Thus, the Bankruptcy Code does not change the state-law definition of consent as applicable to claims among non-debtor parties.[5]

24. As courts have recognized, because the Bankruptcy Code does not govern relationships between claim holders and non-debtor third-parties, state contract principles are the source of authority when considering whether a release is consensual. *See, e.g., Patterson et al. v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641, 684-85 (E.D. Va. 2022) (describing bankruptcy courts in the District of New Jersey as "look[ing] to the principles of contract law rather than the bankruptcy court's confirmation authority to conclude that the validity of the releases requires affirmative consent"); *Smallhold, Inc.*, No. 14-10267, 2024 WL 4296938, at *11 (Bankr. D. Del. Sept. 25, 2024) (holding that "some sort of affirmative expression of consent that would be sufficient as a matter of contract law" is required); *In re SunEdison, Inc.*, 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a creditor consents to a third-party release."); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 506 (Bankr. D.N.J. 1997) (holding that a third-party release "is no different from any other settlement or contract"); *id.* at 507 (holding that "the validity of the release . . . hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order") (internal

---

[5] Indeed, even as to a debtor, it is well settled that whether parties have entered a valid settlement agreement is governed by state law. *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled by state law."); *De La Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where the United States is not a party, it is well established that settlement agreements in pending bankruptcy cases are considered contract matters governed by state law."). That is because "the basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Travelers Cas. & Sur. Co. of America v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 450-451 (2007) (quotation marks omitted); *Butner v. United States*, 440 U.S. 48 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.").

quotation marks omitted) (alterations in original).  As one court recently held, because "nothing in the bankruptcy code contemplates (much less authorizes it)' . . . . any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent."  *In re Tonawanda Coke Corp.*, 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024) (quoting Purdue, 144 S. Ct. at 2086).  Accordingly, "any such consensual agreement would be governed by state law."  *Id.*

25.     Here, the Debtor does not meet the burden of establishing that the releasing parties will affirmatively agree to release their property rights in a manner sufficient to demonstrate consent under state law.

### ii.     *Under State law, silence does not confer consent in contract, except limited circumstances not applicable here*

26.     The "general rule of contracts is that silence cannot manifest consent." *Patterson*, 636 B.R. at 686; *see also, e.g.*, *McGurn v. Bell Microproducts, Inc.*, 284 F.3d 86, 90 (1st Cir. 2002) (recognizing "general rule" that "silence in response to an offer . . . does not constitute acceptance of the offer").  Moreover, "[o]rdinarily[,] an offeror does not have power to cause the silence of the offeree to operate as acceptance."  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981); *accord* 1 Corbin on Contracts § 3.19 (2018); 4 Williston on Contracts § 6:67 (4th ed.); *Reichert v. Rapid Investments, Inc.*, 56 F.4th 1220, 1227 (9th Cir. 2022) ("[T]he offeror cannot prescribe conditions so as to turn silence into acceptance.").  Instead, under state law, an agreement to release claims—like any other contract—generally requires a manifestation of assent to that agreement.  *See, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 17(1) ("[T]he formation of a contract requires a bargain in which there is manifestation of mutual assent to the exchange and a consideration.").  Consent cannot be imputed or "deemed" based on a party's failure to object— rather, consent must be affirmatively shown to exist.  *See, e.g.*, *id*.; RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.

27.     There are only very limited exceptions to that principle.  "[T]he exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of intention that silence may operate as acceptance.  Even in those cases the contract may be unenforceable under the Statute of Frauds."  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

28.     But absent such extraordinary circumstances, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak."  *Id.* And "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." *Id.* § 69, cmt. c; *see also Patterson*, 636 B.R. at 686 (explaining how contract law does not support deeming consent based upon a failure to opt out).

29.     New York law, which the Plan says should govern it, Plan, Art. XIII.13.8, and Texas law, are in accord.[6]

30.     Under New York contract law, silence does not equal consent except under limited circumstances not applicable in this case. The creditor must affirmatively sign a writing under which it expressly agrees to discharge the non-debtor parties. *See Matter of Tanenbaum Textile Co. v. Schlanger*, 287 N.Y. 400 (1942).  New York General Obligations Law provides:

> An agreement, promise or undertaking to change or modify, or to discharge in whole or in part, any ... obligation ... shall not be invalid because of the absence of consideration, provided that the agreement, promise or undertaking changing,

---

[6] While the Plan provides that its construction and enforcement is governed by the laws of the State of New York, debtors cannot choose the law to apply to contracts between non-debtors. Rather, ordinary choice of law principles govern which state's law applies to contracts between non-debtors, although a choice of law analysis may not be necessary absent any assertion that there is a difference in potentially applicable state laws governing what constitutes consent.  *See Smallhold*, 2024 WL 4296938, at *13 n.57.

modifying, or discharging such ... obligation ... shall be in writing and signed by the party against whom it is sought to enforce the change, modification or discharge, or by his agent.

N.Y. GEN. OBLIG. LAW§ 5-1103 (McKinney 2022).

31.     Without such a writing from each affected creditor, the release becomes a mere proposal that is unenforceable under state law. In applying New York contract law, a court recently refused to approve a disclosure statement for a plan that would bind creditors to a third-party release unless the creditors opted out. *In re Tonawanda Coke Corp.*, 662 B.R. 220, 222-23 (Bankr. W.D.N.Y. 2024) at *4. The court stated, "[e]ven aside from the specific requirements for a writing under the General Obligations Law,  . . . [c]onsent and failure to object are not synonymous." *Id.* at 223 (internal quotation marks omitted).  It explained: "In many Chapter 11 cases, only a small percentage of creditors will cast ballots on confirmation of a plan. Many who do vote may overlook the box indicating a preference to deny a release to third parties." *Id.*  Thus, "[a]bsent a writing expressly agreeing to a release of non-debtors, creditors have not given consent as required by the Supreme Court in *Harrington v. Purdue Pharma*." *Id.*

32.     Likewise, under Texas law, silence does not equate to consent except under limited circumstances not applicable in these cases. *See Tex. Ass'n of Ctys. Cty. Gov't Risk Mgmt. Pool v. Matagorda Cty.*, 52 S.W.3d 128, 132–33 (Tex. 2000). Further, the Commission of Appeals of Texas stated that:

> A contract implied in fact is one in which, under the circumstances, the acts of the parties are such as to indicate according to the ordinary course of dealing and the common understanding of men a mutual intention to contract, as where one accepts the tendered service of another under circumstances justifying the inference that such other expected to be paid for such services. Of course, in implied contracts as well as express contracts there must be shown the element of mutual agreement. But the only difference is that such agreement is expressly stated, in the one instance, and is inferred from the circumstances, in the other. A contract implied from the facts and circumstances in evidence is as binding as would be an expressed one.

12

*Marr-Piper Co. v. Bullis*, 1 S.W.2d 572, 575 (Tex. Comm'n App. 1928).

33.      Silence and inaction, however, will generally not be deemed assent to an offer because, with silence, there is no meeting of the minds. *Matagorda Cty.*, 52 S.W.3d at 132–33 (quoting 2 Williston on Contracts § 6:49 (4th ed. 1991)). "[A]s a matter of law, when a party is unilaterally informed of [a contract term], 'mere failure to object within a reasonable time . . ., without more, could not establish an agreement between the parties.'" *In re Couture Hotel Corp.*, 554 B.R. 369, 381 (Bankr. N.D. Tex. 2016) (quoting *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*, 665 S.W. 2d 443, 445–46 (Tex. 1982)). "[A] meeting of the minds is an essential element of an implied in fact contract." *Id.* (quoting *Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 49 (Tex. 2008)) (internal quotation omitted). 2008)); *see also Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 152 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ("Silence cannot satisfy the basic requirements of contract creation.").

34.      As the Fifth Circuit explained: "Tacit acquiescence between relative strangers ignores the basic tenets of contract law. . . .   While there may be exceptions in cases involving parties with longstanding relationships, generally speaking, 'silence or inaction does not constitute acceptance of an offer.'"  *Imperial Ind. Supply Co v. Thomas*, 825 F. App'x 204, 207 (5th Cir. Sept. 2, 2020) (quoting *Norcia v. Samsung Telecomms Am., LLC*, 845 F.3d 1279, 1284 (9th Cir. 2017)).  As another District Court within this Circuit explained, "[t]his idea that [the plaintiff] can unilaterally bind another party to a contract, however, is contrary to law.  It is a fundamental principle of contract law that to create an enforceable contract, there must be a clear and definite offer followed by a clear and definite acceptance in accordance with the offer's terms." *Redmond v. Williams*, No. 22-cv-00910, 2023 LW 7984388, at *6 (E.D. Tex. Sept. 13, 2023).  Acceptance of an offer "is established only by conforming to the rules governing acceptance, not a separate

theory of 'waiver and ratification.'" *Houston Dairy, Inc. v. John Hancock Mut. Life Ins. Co.*, 643 F.2d 1185, 1186 (5th Cir. 1981).

    *iii.*    **The Debtor Cannot Impose Releases by Treating a Failure to Opt Out as a Form of Default**

    35.    Applicable state contract law cannot be disregarded on a procedural default theory, previously applied by some courts, under which creditors who remain silent are held to have forfeited their rights against non-debtors because they received notice of the non-debtor release but failed to object, just as they would forfeit their right to object to a debtor's plan if they failed timely to do so. In particular, this Court in *In re Robertshaw US Holding Corp.*, No. 24-90052, 2024 WL 3897812, at *17 (Bankr. S.D. Tex. Aug. 16, 2024), cited *In re Arsenal Intermediate Holdings, LLC* for the proposition that "there is nothing improper with an opt-out feature for consensual Third-Party Release in a chapter 11 plan." These courts had reasoned that so long as the creditors received notice of a proposed non-debtor release and were informed of the consequences if they did not opt out or object to that release, there is no unfairness or deprivation of due process from binding them to the release. *Cf. Smallhold*, 2024 WL 4296938, at *1 (describing this reasoning as having treated a mere "failure to opt out" as "allow[ing] entry of the third-party release to be entered by default"). This is wrong. Forfeiture principles do not apply to consent, which requires an affirmative manifestation of assent, not a mere failure to object. As the court in *Smallhold* recently explained, "[u]nder established principles," courts may enter relief against a party who has procedurally defaulted by not responding "only after satisfying themselves that the relief the plaintiff seeks is relief that is at least potentially available to the plaintiff in

litigation" that is actually contested.[7]  *Smallhold, Inc.*, 2024 WL 4296938, at \*2; *see also id*. at

\*13 ("[T]he obligation of a party served with pleadings to appear and protect its rights is limited

to those circumstances in which it would be appropriate for a court to enter a default judgment if

a litigant failed to do so.").  But a third-party release is not "an ordinary plan provision that can

properly be entered by 'default' in the absence of an objection."  *Id.*  "It is unlike the listed cure

amount where one can properly impose on a creditor the duty to object, and in the absence of such

an objection bind the creditor to the judgment."  *Id.*  Because a nonconsensual nondebtor release

is "per se unlawful…. it is not the kind of provision that would be imposed on a creditor on account

of that creditor's default." *Id.*  That is because, unlike for a creditor's claims against the debtor, the

Bankruptcy Code affords no affirmative authority to order a release of claims against third parties.

"It is reasonable to require creditors to pay attention to what the debtor is doing in bankruptcy as

it relates to the creditor's rights against the debtor.  But as to the creditor's rights against third

parties – which belong to the creditor and not the bankruptcy estate – a creditor should not expect

that those rights are even subject to being given away through the debtor's bankruptcy."

*Smallhold, Inc.*, 2024 WL 4296938, at \*12

36.     The *Smallhold* court provided an illustration that makes obvious why, even with

clear notice, a mere failure to object or opt out of a proposed release does not constitute the

manifestation of assent necessary to constitute consent under state law:

37.     Consider, for example, a plan of reorganization that provided that each creditor who

failed to check an "opt out" box on a ballot was required to make a $100 contribution to the college

education fund for the children of the CEO of the debtor.  Just as in the case of Party A's letter to

---

[7] As discussed further below, *infra* ¶ 15, although the United States Trustee agrees with much of the analysis in *Smallhold*, he disagrees with its conclusion that voting on a plan combined with a failure to opt out constitutes consent.

Party B, no court would find that in these circumstances, a creditor that never returned a ballot could properly be subject to a legally enforceable obligation to make the $100 contribution. *Id*. at *2. None of the cases that imposed a non-debtor release based merely on a creditor's failure to object or opt out "provides any limiting principle that would distinguish the third-party release from the college education fund plan." *Id*. Thus, it is not "appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release." *Id*. at *10.

38.     Because *Purdue* establishes that a nonconsensual third-party release is "*per se* unlawful," it follows that a third-party release "is not the kind of provision that would be imposed on a creditor on account of that creditor's default." *Id*. at *2. Rather, absent an affirmative showing of consent, a court lacks any power to approve the non-debtor release. And besides the now-discredited default theory, there is "no other justification for treating the failure to 'opt-out' as 'consent' to the release [that] can withstand analytic scrutiny." *Id*. Because a chapter 11 plan cannot permissibly impose non-debtor releases without the affirmative consent of the releasing parties, a release cannot be imposed based on their mere failure to respond regarding the non-debtor release. Rather, an "*affirmative expression of consent* that would be sufficient as a matter of contract law" is required. *Id*. at *11 (emphasis added).[8]

### iv.     *Failing to Opt Out Does Not Provide the Required Affirmative Consent*

39.     Here, the Plan provides that all creditors who do not opt out will provide broad non-debtor Third-Party Release to numerous known and unknown parties. This would deprive creditors of their legal rights under the pretense of consent. Indeed, the Plan's inclusion of a width

---

[8] For those reasons, the *Smallhold* court expressly disapproved of its prior decision in *Arsenal*, which had relied on the procedural default theory. *See id.* at *8 ("On the central question presented, the Court concludes that its decision in *Arsenal* does not survive *Purdue Pharma*.").

class of related parties[9] is so broad that it would be impossible to provide notice to all parties affected by the Third-Party Release. This Court should not approve the Third-Party Release in the Plan because there is not sufficient evidence of manifested consent from creditors to release with their legal rights against non-debtors.

40.     An affirmative agreement—something more than the failure to opt out or object— is required for a non-debtor release to be consensual.  *See Patterson*, 636 B.R. at 686; *Tonawanda Coke Corp.*, 662 B.R. at 222–23.  Failing to "opt out" of an offer is not a manifestation of consent unless one of the exceptions to the rule that silence is not consent applies, such as conduct by the offeree that manifests an intention that silence means acceptance or taking the offered benefits. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). For example, the *Patterson* court, in applying black letter contract principles to opt-out releases in a chapter 11, found that contract law does not support consent by failure to opt out. *Patterson*, 636 B.R. at 686. "Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent." *Id.* at 688 (emphasis added).

41.     The Ninth Circuit's decision in *Norcia*, cited by the Fifth Circuit in *Imperial Ind. Supply Co. v. Thomas*, 825 F. App'x 204, 207 (5th Cir. 2020), illustrates the point.  In *Norcia*, a consumer bought a Samsung phone from a Verizon Wireless store and signed the Verizon Wireless Customer Agreement.  *Norcia*, 845 F.3d at 1282.  Among the contents of the phone's box was a Samsung "Product Safety & Warranty Information" brochure that contained an arbitration

---

[9] In the definitions of Related Parties and Releasing Parties includes any "Entity and its current and former Affiliates, and such Entities' their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), interest holders, predecessors, participants, successors, and assigns, subsidiaries, affiliates, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, underwriters of any securities issued by the Debtor, consultants, representatives, and other professionals . . . ."

provision, which "stated that purchasers could opt out of the arbitration agreement by providing notice to Samsung within 30 calendar days of purchase, either through email or by calling a toll-free telephone number." *Id.* It also stated that opting out would not affect the warranty coverage. *Id.* The customer did not take any steps to opt out. *Id.* When the customer later sued Samsung, Samsung argued that the arbitration provision applied. *Id.* at 1282–83.

42.     As an initial matter, the *Norcia* court rejected the argument that the customer agreed to the arbitration provision by signing his contract with Verizon: "The Customer Agreement is an agreement between Verizon Wireless and its customer. Samsung is not a signatory." 845 F.3d at 1290. That is even more true in the context of a chapter 11 plan. Not only are the non-debtor Released Parties not signatories to it, a chapter 11 plan is a creature of the Bankruptcy Code specifically for determining how the debtor will pay its creditors, not a contract to resolve claims between non-debtors. As the Ninth Circuit has explained, "[w]hen a bankruptcy court discharges the debtor, it does so by operation of the bankruptcy laws, not by consent of the creditors.... [T]he payment which effects a discharge is not consideration for any promise by the creditors, much less for one to release non-party obligators." *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1085 (9th Cir. 2020) (quotation marks omitted).

43.     The Ninth Circuit in *Norcia* further held that the customer's failure to opt out did not constitute consent to arbitrate. Unsurprisingly—because there was no applicable federal law and the question was not whether one could opt out of a class action—the court applied the "general rule," applicable under California law, that "silence or inaction does not constitute acceptance of an offer." 845 F.3d at 1284 (quotation marks omitted); accord *Tex. Ass'n of Ctys. Cty. Gov't Risk Mgmt. Pool v. Matagorda Cty.*, 52 S.W.3d 128, 132–33 (Tex. 2000). The customer did not agree to arbitrate because he did not "sign the brochure or otherwise act in a manner that

would show his intent to use his silence, or failure to opt out, as a means of accepting the arbitration agreement." *Norcia*, 845 F.3d at 1285 (quotation marks omitted).  This was true, even though the customer did take action to accept the offered contract from Verizon Wireless.  "Samsung's offer to arbitrate all disputes with [the customer] cannot be turned into an agreement because the person to whom it is made or sent makes no reply, even though the offer states that silence will be taken as consent, unless an exception to this general rule applies."  845 F.3d at 1286 (quotation marks and citation omitted).

44.     The Ninth Circuit explained that there are two exceptions to this rule—when the offeree has a duty to respond, or when the offeree retains the offered benefits—but held neither exception applied. *Norcia*, 845 F.3d at 1284-85.  There was no state law imposing a duty on the customer to act in response to the offer, the parties did not have a prior course of dealing that might impose such a duty, and the customer did not retain any benefits by failing to act given that the warranty applied whether or not he opted out of the arbitration provision.  *Id.* at 1286.

45.     Here, too, the debtor's creditors have not signed an agreement to release the non-debtor releasees nor acted in any other manner to suggest that their silence manifests acceptance of an offer to release them.

46.     The Plan and Solicitation Materials would impose non-debtor releases on every type of creditor who does not opt out.  *See* Plan Art. X.B.; ECF No. 36-1 at pg. 21.

47.     *First*, voting for a plan without checking an opt-out box does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims against non-debtors.  *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

48.     As an initial matter, merely voting to approve a plan is not an expression of consent to a non-debtor release. *See, e.g., In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007)

("[A] consensual release cannot be based solely on a vote in favor of a plan."); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 507 (Bankr. D.N.J. 1997) (reaching same conclusion). As explained in *Arrowmill*, a voluntary release arises only "because the *creditor agrees*" to it. 211 B.R. at 507 (emphasis in original). There is nothing in the Code that authorizes treating a vote to accept a chapter 11 plan as consent to a third-party release. Instead, the "validity of th[at] release" necessarily "hinges upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order." *Id.* (citation and alterations omitted). Because "a creditor's approval of the plan cannot be deemed an act of assent having significance beyond the confines of the bankruptcy proceedings," "it is not enough for a creditor . . . to simply vote 'yes' as to a plan." *Id.* (quotation marks omitted); accord *Congoleum Corp.*, 362 B.R. at 194; *In re Digital Impact, Inc.*, 223 B.R. 1, 14 (Bankr. N.D. Okla. 1998). Rather, a creditor must "unambiguously manifest[] assent to the release of the nondebtor from liability on its debt." *Arrowmill*, 211 B.R. at 507.

49.     Because merely voting to approve a plan does not manifest consent to a non-debtor release, such a vote plus a failure to opt out is still nothing more than silence with respect to the offer to release claims against non-debtors. Voting to accept a plan but remaining silent about a non-debtor release by failing to check an opt-out box does not fit within any of the exceptions to the rule that silence is not acceptance of an offer.

50.     Creditors who vote for a plan without opting out of a non-debtor release are not "silently tak[ing] offered benefits" from the released non-debtors, such that consent may be inferred. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). The only benefits received by the creditors are distributions from the debtor's chapter 11 plan. Because creditors are entitled to whatever distributions the Plan allocates them regardless of whether they opt out of the

20

nondebtor releases, consent to the nondebtor release cannot be inferred from acceptance of those benefits. *See Norcia*, 845 F.3d at 1286 (explaining that customer's failure to opt out did not imply his consent where warranty applied regardless, meaning that customer did not thereby obtain any additional benefit). Further, non-debtors have no right to prevent a debtor's creditors from receiving distributions under the debtor's chapter 11 plan, and thus acceptance of those distributions does not manifest acceptance of an offer to release non-debtors. *See Railroad Mgmt. Co., L.L.C. v. CFS La. Midstream Co.*, 428 F.3d 214, 223 (5th Cir. 2005) ("In the absence of any evidence that Strong had the right to exclude CFS from the property in question or that CFS accepted any service or thing of value from Strong, no reasonable jury could conclude that CFS's failure to remove its pipeline upon Strong's demand constituted consent to a contract.").

51. Nor does voting to approve a chapter 11 plan while remaining silent about a non-debtor release "manifest [an] intention that silence may operate as acceptance" of an offer to release claims against non-debtors. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a. Because impaired creditors have a federal right under the Bankruptcy Code to vote on a chapter 11 plan, 11 U.S.C. § 1126(a), merely exercising that right does not manifest consent to release claims against non-debtors. Rather, voting on a chapter 11 plan is governed by the Bankruptcy Code, and a favorable vote reflects only approval of the plan's treatment of the voters' claims *against the debtor*.

52. And as in *Norcia*, creditors have no state law duty to respond to an offer to release nondebtors such that their silence can be understood as consent, nor have they any prior course of dealing with the released nondebtors that would impose such a duty. *See Norcia*, 845 F.3d at 1285–86. Nor do creditors have any affirmative obligation to act on a plan, either to vote or to opt out. *See, e.g.*, 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *SunEdison,*

*Inc.*, 576 B.R. at 460–61 (holding creditors have no duty to speak regarding a plan that would allow a court to infer consent from silence). A claimant's vote in favor of a plan while remaining silent regarding a non-debtor release thus does not fit within the exception to the general rule that consent cannot be inferred from silence.

53.     *Second*, for the same reasons, releases cannot be imposed on those who vote to reject the plan but do not opt out. It is implausible to suggest that a party returning a ballot rejecting the plan but neglecting to opt out of the third-party release is evidencing consent to the third-party release.  Not only is there no "mutual agreement" as to the plan, much less the third-party release, the creditor has expressly stated its rejection of the plan.  As the court in *In re Chassix Holdings, Inc.*, reasoned: "[A] creditor who votes to reject a plan should also be presumed to have rejected the proposed third-party releases that are set forth in the plan.  *The additional 'opt out' requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor.*"  533 B.R. 64, 79 (Bankr. S.D.N.Y. 2015) (emphasis added).

54.     *Third*, even more obviously, the releases cannot be imposed on those who do not vote and do not opt out—whether because they abstain from voting or are ineligible to vote.  *See Smallhold*, 2024 WL 4296938[10]; *Chassix Holdings*, 533 B.R. at 81–82; *In re Wash. Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011).  This applies both to those creditors who simply abstain from voting and those creditors who are not entitled to vote on a plan. The Solicitation Materials provide that "[i]f you (a) **fail to submit a valid Ballot** by the Voting Deadline, [or] (b) **submit the Ballot**

---

[10] The U.S. Trustee recognizes that the court in *Smallhold* found that, in at least some circumstances, the act of voting on a debtor's plan (whether to accept or reject it) combined with a failure to exercise an opt-out option can constitute consent to a non-debtor release.  *See Smallhold,* 2024 WL 4296938, at *14.  The *Smallhold* decision, however, although stating it was applying "ordinary contract principles," 2024 WL 4296938, at *3, failed to faithfully apply those principles to the question of when silence can constitute consent, as discussed further herein.

*but abstain from voting* to accept or reject the Plan without checking the box below, . . . in each case *you will be deemed to consent to the releases set forth in Article X.B of the Plan*." ECF No. 36-1 at pg. 21 (emphasis added). The Plan also includes among the "Releasing Parties" those who are deemed accept the Plan unless they opt out. *Id.*

55.     Those who abstain from voting cannot be said to be consenting to anything—they are taking no action with respect to the plan.  The same is true for those who have no right to vote on a plan—whether an unimpaired creditor or an impaired creditor receiving nothing under a plan who is deemed to reject the plan.  Creditors who do not vote on a plan do not manifest consent to a non-debtor release by failing to return an opt out form.

56.     Even where there are conspicuous warnings in the disclosure statement, the plan ballots, or an opt-out form that silence or inaction will constitute consent to a release, that is not sufficient to convert a party's silence into consent to the release. *SunEdison*, 576 B.R. at 458–61. Just as creditors have no federal or state law duty to vote on a plan, they also have no obligation to read a plan.[11]  And creditors who have no intention of voting in the first place are unlikely to do so.  Moreover, parties who are solicited but do not vote may have failed to vote for reasons other than an intention to assent to the releases.  *SunEdison*, 576 B.R. at 461.

57.     Thus, the court in *SunEdison* rejected the debtors' argument that the warning in the disclosure statement and on the ballots regarding the potential effect of silence gave rise to a duty to speak, and the non-voting creditors' failure to object to the plan or to reject the plan should be deemed their consent to the release. *Id.* at 460–61. The court found that the nonvoting creditors' silence was misleading or that the nonvoting creditors' silence signified their intention to consent to the release (finding that silence could easily be attributable to other causes). *Id.*

---

[11] Here, the Plan and associated materials, including the Disclosure Statement, run to 391 pages.

58.     Simply put, "[f]ailing to return a ballot is not a sufficient manifestation of consent to a third-party release." *In re Wash. Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011); *see also Chassix Holdings*, 533 B.R. at 81–82.  An "opt out mechanism is not sufficient to support the third-party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place)." *Wash. Mut., Inc.*, 442 B.R. at 355.

59.     "Charging all inactive creditors with full knowledge of the scope and implications of the proposed Third-Party Release, and implying a 'consent' to the Third-Party Release based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point."  *Chassix Holdings*, 533 B.R. 64 at 81  It is reasonable to require creditors to pay attention to what the debtor is doing in bankruptcy as it relates to the creditor's rights against the debtor.  But as to the creditor's rights against third parties – which belong to the creditor and not the bankruptcy estate – a creditor should not expect that those rights are even subject to being given away through the debtor's bankruptcy." *Smallhold, Inc.*, 2024 WL 4296938, at *12; *see also id.* at *10 (discussing *Chassix*).  As the court in *Emerge Energy Services, LP,* similarly explained, "[a] party's receipt of a notice imposing an artificial opt-out requirement, the recipient's possible understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as waiver through a party's silence or inaction. No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (emphasis in original). "[B]asic contract principles" require affirmative assent, not inferences drawn from inaction that in fact may reflect only "[c]arelessness, inattentiveness, or mistake." *Id.*

60.     In addition, Judge Scott W. Everett in the Northern District of Texas found that because "there are no Federal Bankruptcy Rules or Federal Civil Rules that govern whether or not somebody can assent through silence to a deemed release," courts should look at Texas law to

determine whether opt-out provisions are effective to confer consent to a third party. *In re 4 W. Holdings, Inc.*, Case No. 18-30777, ECF No. 2086 at 7, 15 (Bankr. N.D. Tex. Oct. 18, 2022). In examining Texas state law, Judge Everett held in *4 West Holdings, Inc.* that silence does not equate to consent under Texas contract law and that none of the three exceptions to that principle applied to the opt-out provisions. *Id.* at 17-20.

> ### v.   The Debtor Has Not Provided Notice to Procure Affirmative Consent from All Parties Affected by the Third-Party Release

61.     *Finally*, the there is no evidence in the Plan or the solicitation materials that the Debtor provided notice of their deemed consent to the Third-Party Release to the unusually broad breadth of parties included in the definition of "Releasing Parties," which includes a laundry list of myriad categories of unidentified parties.

62.     Indeed, the record is devoid of any evidence showing that the Debtor made efforts to (1) identify the parties referenced above that are affected by the Third-Party Release; (2) provide notice to the parties referenced above of the Third-Party Release; and (3) provide an opportunity to manifest their affirmative consent to the Third-Party Release in the Plan.  Because these affected parties were not even provided notice of the nondebtor release, much less an opportunity to consent or even opt out, imposing nondebtor releases on them is inarguably nonconsensual and in violation of the Supreme Court's recent ruling in Purdue.

63.     There is no acceptance of an offer when there is insufficient notice of the alleged contractual terms.  *See Norcia*, 845 F.3d at 1285 ("[A]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious.") (quotation marks omitted).

64.     Furthermore, failure to return an opt-out form is not consent because—whether they are asked to vote or not—claimants have no reason to expect that an offer to contract with non-debtors will be included in the plan solicitation.  As the Third Circuit has explained, there can be no presumption that someone has agreed to contractual provisions of which they are "on notice," unless "there is a reasonable basis to conclude that consumers will have understood the document contained a bilateral agreement."  *See Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-118 (3d Cir. 2017).  *See also Norcia*, 845 F.3d at 1289 ("[N]o contract is formed when the writing does not appear to be a contract and the terms are not called to the attention of the recipient.") (quotation marks omitted).

### vi.     *Opt-Outs in Class Action are Distinct from Opt-Outs in a Chapter 11 Plan*

65.     This Court in *Robertshaw* referenced opt outs in class actions as support for deeming a failure to opt out as consent to a non-debtor release. *In re Robertshaw*, 662 B.R. 300, 323 n.120 (Bankr. S.D. Tex. 2024). That analogy to class-action procedure is inapt.

66.     Rule 23, incorporated by Bankruptcy Rule 7023 only for adversary proceedings, is irrelevant.  This is not an adversary proceeding to which Bankruptcy Rule 7023 applies and no one has sought class treatment here.  Fed. R. Bankr. P. 7023.  Thus, by their own terms, neither Rule 23 nor Bankruptcy Rule 7023 applies.

67.     And Congress has not seen fit to enact a Code provision authorizing imposing non-debtor releases in chapter 11 plans on those who fail to opt out. Importantly, "people who fail to respond to class action notices are bound because that is the legal consequence that the Rule specifies, and not on the theory that their inaction is the equivalent of an affirmative joinder in an action." *Chassix Holdings*, 533 B.R. at 78.  By contrast, in the context of non-debtor releases imposed via a chapter 11 plan, "[t]here is no rule that specifies an 'opt out' mechanism or a 'deemed consent' mechanism."  *Id.*  Absent a duly enacted statute or federal rule of procedure, a

court cannot unilaterally transplant Rule 23(b)(3)'s class-action "opt out" procedure to bankruptcy proceedings to confirm a chapter 11 plan.

68.     Further, a rule of procedure, including Bankruptcy Rule 7023, cannot modify or abridge state law regarding what constitutes consent to a release.  28 U.S.C. § 2075.  That follows from the fact that no provision in the Code authorizes treatment of creditors' claims against non-debtors as a class action.  There is no federal class action statute that preempts state contract law, which (as discussed above) requires affirmative consent.

69.     Indeed, as the court found in *Patterson*, "the comparison to class action litigation highlights the impropriety of finding releases consensual based merely on a failure to opt out" because in class actions, unlike chapter 11 plan confirmations, "courts must ensure that the class action complies with the unique requirements of Rule 23 of the Federal Rules of Civil Procedure."[12]  636 B.R. at 686.

70.     Federal class actions may proceed only after a court certifies that the class meets a series of rigorous procedural requirements designed to ensure the appropriateness and fairness of class-wide litigation.  For any class to be certified, Rule 23(a) requires a court to find: (1) commonality ("questions of law or fact common to the class"); (2) typicality (named parties' claims or defenses "are typical . . . of the class"); and (3) adequacy of representation (representatives "will fairly and adequately protect the interests of the class").  *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 613 (1997) (quoting Fed. R. Civ. P. 23); *see id.* at 621 (noting that these standards protect against the variability of equitable justice).

---

[12] Further, "in the class action context there is a public policy that favors the consolidation of similar cases and that justifies the imposition of a rule that binds class members who have not affirmatively opted out." *Chassix Holdings, Inc.*, 533 B.R. at 78. By contrast, in the context of non-debtor releases imposed via a chapter 11 plan, there is no "general 'public policy' in favor of making third party releases applicable to as many creditors as possible." *Id*.

71.     Once those threshold showings are made, Rule 23(b) then requires that one of three further predicates satisfied. Speaking generally, Rule 23(b)(1) authorizes class treatment where "individual adjudications would be impossible or unworkable," while Rule 23(b)(2) authorizes class actions where "the relief sought must perforce affect the entire class at once." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011). Rule 23(b)(3), in turn, authorizes class treatment only where a court finds both that "the questions of law or fact common to class members predominate over any questions affecting only individual members" and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Opt-out procedures are only available in class actions under Rule 23(b)(3), not those under Rule 23(b)(1) and 23(b)(2). *See Wal-Mart Stores*, 564 U.S. at 362 (explaining that "unlike (b)(1) and (b)(2) classes, the (b)(3) class is not mandatory").

72.     Class action procedures also entail additional procedural safeguards. A class must be specifically defined to identify the class members and the class claims. Fed. R. Civ. P. 23(c)(1)(B). Moreover, the court must appoint class counsel that can best "represent the interests of the class." Fed. R. Civ. P. 23(g). And for classes certified under Rule 23(b)(3), class members must receive "the best notice practicable" that must "clearly and concisely state in plain, easily understood language:" the nature of the action, who the class is, what their claims or defenses are; their right to appear in the action through an attorney; their right to exclude themselves from the action; how and when to exclude themselves; and the binding nature of the judgment if they do not. In other words, the Federal Rules of Civil Procedure set objective procedural protections before a class can be certified and potential members bound.

73.     Further, "any class settlement that would bind absent class members requires court approval." *Patterson*, 636 B.R. at 686 (citing Fed. R. Civ. P. 23(e)). And approval may only be

28

granted if, after a hearing, the court finds the settlement is "'fair, reasonable, and adequate' taking into account whether '(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate; and (D) the proposal treats class members equitably relative to each other.'"  Id. at 687 (quoting Fed. R. Civ. P. 23(e)(2)).  "The inquiry appropriate under Rule 23(e) . . . protects unnamed class members from unjust or unfair settlements affecting their rights." *Windsor*, 521 U.S. at 623.

74.     None of these protections exist in the context of a non-debtor release in a bankruptcy action." *Patterson*, 636 B.R. at 686.  "[N]o party litigates on behalf of the absent releasing party." *Id.; see also Smallhold*, 2024 WL 4296938, at *12 n.53 ("[I]n the class action context, a class is only certified after a court makes a factual finding that the named representative is an appropriate representative of the unnamed class members.  In the plan context, there is no named plaintiff, found by the court to be an adequate representative, whose actions may presumptively bind others.").  And "[n]o party with a typical claim has a duty to ensure that he fairly and adequately represents the best interests of the absent releasing party." *Patterson*, 636 B.R. at 686.  "Moreover, the absent releasing party does not enjoy counsel that will represent his best interests in his stead."[13] *Id.*

75.     Finally, in a class action, members that fail to opt out have claims litigated on their behalf, and they may receive whatever proceeds are won in that litigation.  Under a chapter 11 plan with non-debtor releases, although the releasing creditors may receive a distribution under the plan for their claims against a debtor, they lose their claims against the released non-debtors and any

---

[13] Although the official committee of unsecured creditors owes a fiduciary duty to the unsecured creditor body as a whole, it does not owe a duty to any individual creditor or any specific group of creditors, and the diverse body of unsecured creditors to whom it owes duties often has conflicting interests. *See In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 717, 722 (Bankr. S.D.N.Y. 1992) (fiduciary duty of individual members of an official committee "extends to the class as a whole, not to its individual members"). Further, the committee's duties relate only to claims against the debtor, not claims against non-debtors.

corresponding compensation forever if they fail to take affirmative action to opt out or object. Indeed, if a mere failure to opt out constitutes consent to a non-debtor release in bankruptcy, "then no court carries an obligation to ensure the fairness, reasonableness and adequacy of the relief afforded the absent releasing parties." *Patterson*, 636 B.R. at 687.

76.     Notably, state law also provides class-action procedures, with similar procedural protections to federal class actions, in which unnamed class members are bound by a court-approved class settlement unless they opt out. *See* Tex. R. Civ. P. 42. But outside of that class-action context, ordinary contract principles apply, and a person cannot force a contract on someone else by deeming silence, such as a failure to "opt out," to be consent, except in narrow circumstances inapplicable here. *See supra* ¶¶ 28–42.

**C.     Objection No. 2 - The Application of the Injunction to Enforce the Third-Party Release and the Exculpation Provision Also Violates Purdue and the Bankruptcy Code.**

77.     This Court may not approve the injunction enforcing the third-party release by barring claims against non-debtors. *Purdue* stands for the proposition that non-consensual third-party releases and injunctions are generally not permitted by the Bankruptcy Code. *See Purdue*, 144 S. Ct. at 2088.

78.     First, as the *Purdue* Court noted, the Bankruptcy Code allows courts to issue an injunction in support of a non-consensual, third-party release in exactly one context:  asbestos-related bankruptcies, and these cases are not asbestos-related. *See Purdue Pharma*, 144 S. Ct. at 2085 (citing 11 U.S.C. § 524(g)).

79.     Second, even releases between non-debtors are deemed consensual, there is no Code provision that authorizes chapter 11 plans or confirmation orders to include injunctions to enforce them.

80.     Third, such an injunction is not warranted by the traditional factors that support injunctive relief.  A party seeking an injunction "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("An injunction should issue only where the intervention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.'") (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919)); *id.* (noting that an injunction is an "extraordinary remedy"); *see also Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir. 1973) (stating elements movant must establish to obtain injunctive relief).  The Debtor has made no attempt to show that any of these factors are met.  Nor could it.  If the release is truly consensual, there is no threatened litigation and no need for an injunction to prevent irreparable harm to either the estate or the released parties. A consensual release may serve as an affirmative defense in any ensuing, post-effective date litigation between the third party releasees and releasors, but there is no reason for this Court to be involved with the post-effective date enforcement of consensual releases.  Moreover, this injunction essentially precludes any party deemed to consent to this release from raising any issue with respect to the effectiveness or enforceability of the release (such as mistake or lack of capacity) under applicable non-bankruptcy law.  Similarly, there is no statutory authority in the Bankruptcy Code that justifies an injunction to enforce the proposed exculpation, and the Debtors have shown no need for an injunction to prevent "irreparable harm" to either the estates or the released parties.

## CONCLUSION

81.     The Court should not confirm the Plan because it will impermissibly impose the Third-Party Release on parties who have not affirmatively and unambiguously consented to broad releases. The Debtor's use of the opt-out provisions in the Solicitation Materials and Plan is insufficient to confer a party's manifested consent to the Third-Party Release. Further, the individuals and entities included in the definition of Releasing Party include affected parties that have not been identified or provided notice of the Third-Party Release and the Debtor has provided no evidence that such creditors have consented. The Plan also includes an injunction to enforce the Third-Party Release and exculpation provision that is not statutorily authorized.

82.     For the reasons above, the Court should deny confirmation of the Plan and grant such other and further relief as it may deem just and proper.

Date: December 30, 2024                    Respectfully Submitted,

                                           KEVIN M. EPSTEIN
                                           UNITED STATES TRUSTEE
                                           REGION 7, SOUTHERN AND WESTERN
                                           DISTRICTS OF TEXAS

                                           By: */s/ Vianey Garza*
                                               Vianey Garza, Trial Attorney
                                               Tex. Bar No. 24083057/Fed. ID No. 1812278
                                               515 Rusk, Suite 3516
                                               Houston, Texas 77002
                                               (713) 718-4650 – Telephone
                                               (713) 718-4670 – Fax
                                               Email: Vianey.Garza@usdoj.gov

### CERTIFICATE OF SERVICE

        I hereby certify that on December 30, 2024 a copy of the foregoing *United States Trustee's Objection to Debtor's Prepackaged Plan of Reorganization for Vroom, Inc. Under Chapter 11 of the Bankruptcy Code* was served by ECF transmission on those parties registered to receive electronic notices.

                                           By: */s/ Vianey Garza*
                                               Vianey Garza